BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General, Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
United States Department of Justice, Civil Division
950 Pennsylvania Ave NW, Ofc. 3631
Washington, DC 20530
Telephone: (202) 307-1697
Email: Sean.Skedzielewski@usdoj.gov

BILAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
PAUL (BART) GREEN (Cal. Bar No. 300847)
Assistant United States Attorney
        Federal Building, Suite 7516
        300 North Los Angeles Street
        Los Angeles, California 90012
        Telephone: (213) 894-0805
        Email: Paul.Green@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>            v.<br><br>CITY OF LOS ANGELES; KAREN BASS, Mayor of Los Angeles, in her official capacity; LOS ANGELES CITY COUNCIL; MARQUEECE HARRIS-DAWSON, President of the Los Angeles City Council, in his official capacity,<br><br>            Defendants. | No. 2:25-cv-05917<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

## **INTRODUCTION**

1.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

2.      In 2024, then candidate Donald J. Trump campaigned and won the presidential election on a platform of deporting the millions of illegal immigrants the previous administration permitted, through its open borders policy, to enter the country unlawfully. Days after now President Trump won the November 5, 2024 election, the Los Angeles City Council, wishing to thwart the will of the American people regarding deportations, began the process of codifying into law its Sanctuary City policies. The Sanctuary City ordinance titled "Prohibition of the Use of City Resources for Federal Immigration Enforcement" was signed into law by Mayor Karen Bass on December 9, 2024. See L.A. Admin. Code § 19.190 *et seq.* (Ord. No. 188441, 2024) (the "Ordinance"). The express purpose of Los Angeles' Sanctuary City law is to thwart Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") from carrying out their statutory obligations as directed by Congress. The council members who passed the bill have publicly declared as much. Councilmember Hugo Soto-Martinez proclaimed that "[w]e refuse to stand by and let Donald Trump deport [illegal immigrants]."[1]

3.      The United States is currently facing a crisis of illegal immigration. *See*, *e.g.*, Proclamation 10,886, Declaring a National Emergency at the Southern Border of the United States, 90 Fed. Reg. 8327 (Jan. 20, 2025). But its efforts to address that crisis are hindered by Sanctuary Cities such as the City of Los Angeles, which refuse to cooperate or share information, even when requested, with federal immigration authorities.

4.      The City of Los Angeles' Sanctuary City laws are illegal. Those laws and

---

[1] Nithya Raman, *City Council Votes to Establish Los Angeles as a 'Sanctuary City'*, DISTRICT 4 PRESS RELEASES (Nov. 19, 2024), https://cd4.lacity.gov/press-releases/city-council-votes-to-establish-los-angeles-as-a-sanctuary-city/.

policies are designed to and in fact do interfere with and discriminate against the Federal Government's enforcement of federal immigration law in violation of the Supremacy Clause of the United States Constitution.

5.    The challenged law and policies of the City of Los Angeles obstruct the Federal Government's enforcement of federal immigration law and impede consultation and communication between federal, state, and local law enforcement officials that is necessary for federal officials to carry out federal immigration law and keep Americans safe.

6.    The practical upshot of Los Angeles' refusal to cooperate with federal immigration authorities has, since June 6, 2025, been lawlessness, rioting, looting, and vandalism. The situation became so dire that the Federal Government deployed the California National Guard and United States Marines to quell the chaos.

7.    A direct confrontation with federal immigration authorities was the inevitable outcome of the Sanctuary City law. Mayor of Los Angeles Karen Bass' response to that confrontation has been to blame the riots on ICE for "enter[ing] our city and provok[ing] the city" in order to carry out federal immigration law.[2] Mayor Bass also claims that ICE has been operating in the City of Los Angeles merely "as a pretext to federalize the National Guard."[3] Los Angeles has sought to do nothing short of prohibit ICE from operating within city limits, directly contrary to federal immigration law.

8.    Sanctuary City laws and policies are designed to deliberately impede federal immigration officers' ability to carry out their responsibilities in those jurisdictions. The Los Angeles Ordinance and other policies intentionally discriminate against the Federal Government by treating federal immigration authorities differently

---

[2] *"This is Los Angeles": Mayor Bass And More Than 100 Angelenos Gather In Show of Unity and Peace Calling For End to Immigration Raids*, https://mayor.lacity.gov/news/los-angeles-mayor-bass-and-more-100-angelenos-gather-show-unity-and-peace-calling-end. (last visited June 16, 2025).

[3] *Id.*

3

than other law enforcement agents through access restrictions both to property and to individual detainees, by prohibiting contractors and sub-contractors from providing information, and by disfavoring federal criminal laws that the City of Los Angeles has decided not to comply with. The Supremacy Clause prohibits the City of Los Angeles and its officials from singling out the Federal Government for adverse treatment—as the challenged law and policies do—thereby discriminating against the Federal Government. Accordingly, the law and policies challenged here are invalid and should be enjoined.

9.     The Los Angeles Ordinance and other policies intentionally obstruct the sharing of information envisioned by Congress, thereby impairing federal apprehension and detention of removable aliens, including dangerous criminals, as required by federal law. Obstructionist Sanctuary City laws preclude Los Angeles officials and law enforcement agencies from assisting federal immigration authorities unless federal officials procure criminal arrest warrants to take custody of removable aliens. The preferences of the City of Los Angeles notwithstanding, Congress made an explicit policy choice that such removals can be effectuated by civil arrest warrants for immigration enforcement.

10.     The Supremacy Clause prohibits the City of Los Angeles and its officials from obstructing the Federal Government's ability to enforce laws that Congress has enacted or to take actions entrusted to it by the Constitution.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

12.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b), because Defendant City of Los Angeles and its defendant officials reside within the Central District of California and because the Defendants' acts or omissions giving rise to this Complaint arose from events occurring within this judicial district.

13.     The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

## PARTIES

14.    Plaintiff is the United States of America. The United States is vested with plenary authority to regulate immigration under its statutory and constitutional authorities. It is responsible for enforcing the federal immigration laws through its agencies—including the Departments of Justice, State, Labor, and Homeland Security, along with DHS's component agencies, including ICE and CBP.

15.    Defendant City of Los Angeles is a city in the State of California, Los Angeles County.

16.    Defendant Karen Bass is the Mayor of the City of Los Angeles.

17.    Defendant City of Los Angeles City Council is the governing and legislative body of the City of Los Angeles. It is responsible for setting the City of Los Angeles' policy through ordinances and resolutions and for adopting the City's budget. The City Council legislates by passing ordinances which become City laws. The City Council also has the power to amend or remove City laws.

18.    Defendant Marqueece Harris-Dawson is the President of the Los Angeles City Council and is being sued in his official capacity. Mr. Harris-Dawson was elected President of the City Council in 2024.

19.    All individual Defendants are being sued only in their official capacities.

## CONSTITUTIONAL AND STATUTORY BACKGROUND

20.    The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof[] . . . shall be the supreme Law of the Land[] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

21.    Under the Supremacy Clause, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

22.    A state law is also invalid if it "discriminate[s] against the United States or those with whom it deals[,]" *South Carolina v. Baker*, 485 U.S. 505, 523 (1988), or

purports to regulate the Federal Government, *see Mayo v. United States*, 319 U.S. 441, 445 (1943).

23.    The United States has well-established preemptive authority to regulate immigration matters. *See* U.S. Const. art. I, § 8, cl. 4 (Congress has the power to "establish an uniform Rule of Naturalization."); *Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."). The United States' authority to regulate immigration matters derives from the United States Constitution, numerous acts of Congress, and binding U.S. Supreme Court precedent. *See Arizona*, 567 U.S. at 394. Indeed, Congress strengthened that authority this year with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury."[4] *See* Pub. L. 119-1, § 1 139 Stat. 3 (2025); 8 U.S.C. § 1226(c)(1)(E) (as amended).

24.    Accordingly, "Congress [has] the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain," and "has undoubtedly the right . . . to take all proper means to carry out the system which it provides." *Fong Yue Ting v. United States*, 149 U.S. 698, 714 (1893); *see, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (The United States has the "exclusive[]" control over "any policy toward aliens.").

25.    Thus, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395; *see also* The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101, *et seq*. This scheme codifies the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.,* 8 U.S.C. §§ 1182, 1225, 1226, 1227, 1228, 1231.

---

[4] Press Release, DHS, *President Trump Signs the Laken Riley Act in Law* (Jan. 29, 2025), https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law.

26.     Through this scheme, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Moreover, Congress has affirmatively outlawed any effort to "conceal, harbor, or shield from detection" any "alien in any place[.]" 8 U.S.C. § 1324(a)(1)(A)(iii); *see also* 18 U.S.C. § 1071 (prohibiting harboring or concealing "any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States").

27.     The immigration laws, taken together, codify the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1226a, 1227, 1228, 1231, 1357.

28.     Additionally, "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. "Absent any cooperation at all from local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

29.     The immigration laws thus provide for basic principles of cooperation between state and local governments and the Federal Government. *See, e.g.*, 8 U.S.C. § 1226(d)(1)(A) (federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens"); *id.* § 1373(a) (state and local authorities "may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration agencies "information regarding the citizenship or immigration status, lawful or unlawful, of any individual"); *id.* § 1373(b) (similar).

30.     Critically, Congress passed the latter provision to fix a specific problem, after it observed "certain states and localities were restricting their officials' cooperation with federal immigration authorities." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 96 (2d Cir. 2020); *see New York*, 179 F.3d at 35. Thus, in enacting Section 1373, "Congress

sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York*, 951 F.3d at 97 (citations omitted). Even under the Ninth Circuit's improperly narrow interpretation of this provision, Section 1373 specifies that local officials cannot be restricted from sharing "a person's legal classification under federal law." *United States v. California*, 921 F.3d 865, 892 (9th Cir. 2019).

31.    State and local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *New York*, 179 F.3d at 35.

## FACTUAL BACKGROUND

### The City of Los Angeles' Sanctuary Policies

32.    The City of Los Angeles used to cooperate with enforcement of federal immigration law. In 1979, the Office of the Chief of Police issued a special order requiring Los Angeles Police Department detectives to keep an arrest log of undocumented aliens, notify the Federal Government of such arrests, and forward a daily report listing all arrests to the Federal Government. LAPD Special Order No. 40 (1979). Special Order 40 remains in force today.

33.    In 2017, the California State Legislature enacted House Bill 54, the California Values Act ("CVA"). *See* Cal. Gov't Code § 7282.5 *et seq.* The Office of the Chief of Police for the LAPD, in implementing the CVA, restricted cooperation with federal immigration authorities and ordered that the LAPD "shall not: [i]nvestigate, interrogate, detain, or arrest a person for civil immigration purposes; or [i]nquire into an individual's civil immigration status." LAPD Notice 1.14 (Dec. 29, 2017). The Chief of Police's guidance also, *inter alia*, requires LAPD personnel to "obtain approval from the Department's Immigration Liaison Officer" before "transferring a suspect to federal authorities such as US-ICE or US-CBP based on a probable cause arrest for 8 U.S.C. § 1326(a), (b)(2)," which are two serious felonies under federal law, including the felony

for reentering the country after committing an aggravated felony. *Id.*

34. Other LAPD policies are explained in the Department's Frequently Asked Questions memorandum.

    a. "Does the LAPD transfer arrestees to US-ICE personnel for civil immigration violations? No. The LAPD does not transfer arrestees to ICE custody for civil immigration violations." *The Los Angeles Police Department and Federal Immigration Enforcement: Frequently Asked Questions*, L.A. POLICE DEP'T (Jan. 22, 2018), at 11, https://perma.cc/7BZY-VUZA.

    b. "Does the LAPD extend an arrestee's time in jail based solely on an Immigration Detainer Request? No. Under state law, Department personnel are prohibited from detaining an individual based on a 'hold' or Immigration Detainer Request." *Id.* at 10.

    c. "Will the LAPD extend an arrestee's time in custody if an Immigration Detainer Request is accompanied by a Form I-200 'Warrant for Arrest of Alien' or Form I-205 'Warrant of Removal/Deportation'? No. . . . The LAPD requires a judicial probable cause determination or judicial warrant authorizing an officer to arrest and take into custody the individual for a federal criminal immigration offense or other crime." *Id.*

35. Los Angeles' new Sanctuary City law goes much further than other Sanctuary laws in obstructing immigration operations and directly seeking to undermine the Federal Government's immigration enforcement efforts.

## The City of Los Angeles' Sanctuary City Law

36. On December 9, 2024, the City of Los Angeles enacted its Sanctuary City law titled the "Prohibition of the Use of City Resources for Federal Immigration Enforcement." L.A. Admin. Code § 19.190 *et seq.* (Ord. No. 188441, 2024). The Ordinance was expeditiously processed in anticipation of the January 20, 2025,

presidential inauguration. At the time, the Sanctuary City law's sponsors explained that "[w]e refuse to stand back while Donald Trump tries to deport our neighbors, family, friends, and coworkers."[5] More recently, Mayor Karen Bass, who signed Los Angeles' Sanctuary City ordinance into law, signaled her desire to thwart federal immigration policy. "I want to tell him [President Trump] to stop the raids"[6] and "[p]eace begins with ICE leaving Los Angeles."[7]

37.    The Ordinance prohibits City officials, including law enforcement officers, from participating in federal civil immigration enforcement and limits cooperation with federal immigration enforcement in several ways.

38.    The Ordinance provides that no Los Angeles City personnel are authorized to:

a.    "inquire into or collect information about an individual's Citizenship or Immigration Status," unless that information is used by local authorities to provide services to the individual (L.A. Admin. Code § 19.191(a));

b.    "investigate, cite, arrest, hold, transfer, or detain any person for the purpose of Immigration Enforcement" (*Id.* § 19.191(b));

c.    "respond to any administrative warrant or other request to detain, transfer, or notify any Immigration Agent about the status or release of any individual for the purpose of Immigration Enforcement" (*Id.* § 19.191(c));

---

[5] Nithya Raman, *City Council Votes to Establish Los Angeles as a 'Sanctuary City,'* DISTRICT 4 PRESS RELEASES (Nov. 19, 2024), https://cd4.lacity.gov/press-releases/city-council-votes-to-establish-los-angeles-as-a-sanctuary-city/.

[6] David Zahniser and Julia Wick, *A reluctant brawler, Mayor Bass takes direct aim at Trump over immigration raids*, L.A TIMES, June 13, 2025, https://www.latimes.com/california/story/2025-06-13/bass-takes-direct-aim-at-trump-over-immigration-raids

[7] Brad Brooks and Luc Cohen, *Appeals court allows Trump to keep National Guard in L.A. with Marines on the way*, REUTERS, June 13, 2025, https://www.reuters.com/world/us/marines-prepare-los-angeles-deployment-protests-spread-across-us-2025-06-12/.

d.   "provide any Immigration Agent access to any non-public areas of property owned or controlled by the City, including City jails, for the purpose of Immigration Enforcement" (*Id.* § 19.191(d));

e.   "make any person in City custody available to any Immigration Agent for an interview for the purpose of Immigration Enforcement" (*Id.* §19.191(e)); and

f.   "participate in Immigration Enforcement in any operation, joint operation, or joint task force involving any Immigration Agent." Id. § 19.191(f).

39.   Furthermore, the Ordinance provides that "no City personnel shall provide access to any City data or information that can be used to determine or trace a person's Citizenship or Immigration Status to any Immigration Agent," "[e]xcept as required by 8 U.S.C. 1373 or other applicable federal or state law." L.A. Admin. Code § 19.192. The same provision applies to City contractors. *Id.*

40.   The Ordinance, which prohibits City personnel from sharing an individual's "Citizenship or Immigration Status" with federal immigration authorities, defines that term capaciously to include "all information or classification regarding citizenship of the United States or any other country, place of birth, the authority to reside in or otherwise be present in the United States, including visa status, and the time or manner of a person's entry into the United States." L.A. Admin. Code § 19.190.

41.   The Ordinance defines "Immigration Agent" as "an individual engaged in Immigration Enforcement against natural persons" and goes on to single out "U.S. Immigration and Customs Enforcement or U.S. Customs and Border Protection" and anyone else enforcing 8 U.S.C. § 1357(g). L.A. Admin. Code § 19.190.

42.   "Immigration Enforcement" is broadly defined by the Ordinance to mean "any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any federal civil immigration law against natural persons, and also includes any and all efforts to investigate, enforce, or assist in the investigation or enforcement of any

federal criminal immigration law that penalizes a natural person's presence in, entry, or reentry to, or employment in, the United States." *Id.* Thus, cooperation is barred with respect to serious federal felonies, including reentry of convicted aggravated felons.

43.     Finally, the City Council added an "**URGENCY CLAUSE**" to the Ordinance which admits that the purpose of the law is to thwart the "incoming federal administration," i.e., President Trump's second administration, from carrying out its immigration policies. L.A. Admin. Code § 19.195.2 (emphasis in original). Because the City of Los Angeles found that President Trump's immigration policies "will affect the public peace, health, and safety of all residents across the City," it decided to "limit the City's cooperation with federal immigration enforcement[.]" *Id.*

44.     The City of Los Angeles Office of the City Administrator released an Employee Relations Bulletin on June 6, 2025 specifying to the heads of the City's departments how the Ordinance is to be implemented. It clarifies, *inter alia*, that "[i]f a City facility is *not open to the general public . . .* then city personnel should not grant an Immigration Agent entry to that facility for the purpose of immigration enforcement absent a judicially issued warrant or similar court order." Los Angeles City Administrative Office, *Prohibition on the Use of City Resources for Federal Immigration Enforcement – Ordinance No. 188441* (June 6, 2025) (the "Bulletin") § I.A.1 (emphasis in original).

## The City of Los Angeles' Obstruction of Federal Immigration Enforcement

45.     On June 6, 2025, ICE conducted operations to arrest criminal aliens in the City of Los Angeles. Those operations succeeded in apprehending individuals convicted of murder, burglary, domestic violence, sexual offenses, and other violent crimes.[8]

46.     The same day, the response to these arrests of convicted criminals from "rioters" was "throwing rocks and Molotov cocktails at law enforcement, defacing

---

[8] *See* Press Release, DHS, *ICE Captures Worst of the Worst Illegal Alien Criminals in Los Angeles Including Murderers, Sex Offenders, and Other Violent Criminals* (June 8, 2025), https://www.dhs.gov/news/2025/06/08/ice-captures-worst-worst-illegal-alien-criminals-los-angeles-including-murderers.

public property, setting cars on fire, defacing buildings, assaulting law enforcement, and burning American flags."[9]

47.    On June 7, 2025, President Trump, finding that "[n]umerous incidents of violence and disorder . . . threaten to continue in response to the enforcement of Federal law by U.S. Immigration and Customs Enforcement," deployed 2,000 National Guard troops to "ensure the protection and safety of Federal personnel and property."[10] President Trump further authorized the Secretary of Defense to "employ any other members of the regular Armed Forces as necessary to augment and support the protection of Federal functions and property."[11] Accordingly, Secretary Hegseth deployed 700 U.S. Marines to further aid the protective mission.

48.    On June 10, 2025, in the midst of ongoing protests and riots, Los Angeles City councilmembers called Police Chief Jim McDonnell before the City Council to answer questions about the LAPD's response to the unrest. Rather than encourage closer cooperation with federal law enforcement to prevent further unrest, City Councilmember Imelda Padilla asked the chief to undermine federal enforcement actions by warning the City Council of any impending raids.[12] Chief McDonnell correctly identified that request for what it was: "obstruction of justice."[13]

49.    At the same June 10, 2025 council meeting, City Council President

---

[9] Press Release, DHS, *DHS Sets the Record Straight on LA Riots, Condemns Violence Against Law Enforcement, Destruction of Property and Threats to ICE Agents* (June 10, 2025), https://www.dhs.gov/news/2025/06/10/dhs-sets-record-straight-la-riots-condemns-violence-against-law-enforcement (quoting Assistant Secretary Tricia McLaughlin).

[10] Presidential Memoranda, *Department of Defense Security for the Protection of Department of Homeland Security Functions* (June 7, 2025), https://www.whitehouse.gov/presidential-actions/2025/06/department-of-defense-security-for-the-protection-of-department-of-homeland-security-functions/.

[11] *Id.*

[12] Noah Goldberg and David Zahniser, *L.A. city councilmembers spar with police chief over immigration protests*, L.A. TIMES, June 10, 2025, https://www.latimes.com/california/story/2025-06-10/l-a-city-councilmembers-spar-with-police-chief-over-immigration-protests.

[13] *Id.*

Marqueece Harris-Dawson said of federal immigration officials that "[i]f we know somebody is coming here to do warrantless abductions of the residents of this city, those are not our partners . . . . I don't care what badge they have on or whose orders they're under. They're not our partners."[14]

50.    Furthermore, on June 12, 2025, Mayor Bass responded to the public disturbances by blaming ICE's enforcement of immigration law for the rioting and lawlessness. "Last Thursday, ICE entered our city and provoked the city by chasing people."[15] Rather than choose to cooperate with the enforcement of federal law, Mayor Bass has repeatedly called for President Trump to "stop the raids."[16]

## THE IMPACT OF THE CITY OF LOS ANGELES' SANCTUARY CITY POLICIES ON FEDERAL IMMIGRATION ENFORCEMENT

51.    CBP and ICE conduct enforcement in the City of Los Angeles. CBP in particular is responsible for enforcing the immigration laws at international ports of entry, including the Los Angeles International Airport.

52.    Federal law contemplates that DHS will be able to inspect all applicants for admission and take all appropriate action against those found to be inadmissible to the United States, even those who are in state or local custody. 8 U.S.C. §§ 1182, 1225(b)(2); 8 C.F.R. § 235.2.

53.    With its Ordinance, the City of Los Angeles has gone beyond what controlling precedents have said are permissible. Congress expressly prohibited any federal, state, or local government entity or official from prohibiting, or in any way restricting, any government entity or official from sending to, or receiving from, DHS

---

[14] *Id.*

[15] *"This is Los Angeles": Mayor Bass And More Than 100 Angelenos Gather In Show of Unity and Peace Calling For End to Immigration Raids*, https://mayor.lacity.gov/news/los-angeles-mayor-bass-and-more-100-angelenos-gather-show-unity-and-peace-calling-end. (last visited June 16, 2025).

[16] Karla Rendon, *'Stop the raids.' LA Mayor urges Trump administration to cease immigration operations*, NBC LOS ANGELES, June 14, 2025, https://www.nbclosangeles.com/news/local/la-mayor-urges-trump-to-stop-immigration-raids/3724252/.

14

"information regarding the citizenship or immigration status, lawful or unlawful, of any individual," 8 U.S.C. § 1373(a), or from maintaining and exchanging such information with other law enforcement entities. *Id.* § 1373(b); *see also id.* § 1644.

54.     The Ordinance violates Section 1373 by prohibiting City employees from sharing "information or classification regarding citizenship of the United States, . . . the authority to reside in or otherwise be present in the United States, including visa status, and the time or manner of a person's entry into the United States" with federal immigration officials. L.A. Admin. Code §§ 19.190, 19.191(a), 19.192. While the United States Court of Appeals for the Ninth Circuit has previously held that an earlier Sanctuary law, the CVA, did not conflict with Section 1373, the Los Angeles Ordinance is in direct conflict with Section 1373 and, furthermore, discriminates against the Federal Government in ways that CVA did not, making the Ordinance unlawful. *United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019); *see also* Cal. Gov't Code § 7284.6.

55.     Ordinance Number 188441 runs directly afoul of 8 U.S.C. §§ 1373 and 1644 by forbidding LAPD and other law enforcement officers and officials from communicating with ICE or CBP regarding a detainee's citizenship or immigration status. Thus, the Ordinance prohibits the precise type of information that the court in *California* held it could not. 921 F.3d at 891.

56.     The City of Los Angeles cannot point to the purported savings clause in the Ordinance to avoid direct conflict with federal immigration law. The Ordinance does not allow use of City resources, personnel, or property in federal immigration enforcement "unless required by federal or state law." L.A. Admin. Code § 19.191. But Federal law expressly prohibits restrictions on information sharing activities. 8 U.S.C. § 1373(a). Los Angeles has therefore prohibited the activities that federal law expressly requires that States will not restrict. And by creating a confusing statutory carve out for a provision that by its terms precludes the sharing of immigration status information, the law is an obstacle to effectuation of Section 1373.

57.     Furthermore, the Ordinance fails to provide requisite access to federal

15

immigration authorities contrary to federal law. Since the *California* decision, the Ninth Circuit held that a county executive order precluding county employees from providing necessary logistical services to ICE, much like the Ordinance does here, violated the intergovernmental immunity doctrine by improperly regulating ICE's chosen method of transporting detainees. *United States v. King County, Washington*, 122 F.4th 740 (9th Cir., 2024) ("In so doing, the Executive Order effectively grants King County the 'power to control' ICE's transportation and deportation operations, forcing ICE either to stop using Boeing Field or to use government-owned planes there"). By prohibiting access to City property and access to detainees for interviewing, the Ordinance improperly regulates federal immigration authorities.

58.     Additionally, the Ordinance is preempted by federal law because it illegally discriminates against federal law and against federal immigration authorities. *First* the Ordinance prohibits immigration agents from accessing "*any* non-public areas of property owned or controlled by the city." L.A. Admin. Code § 19.191(c) (emphasis added). The Ordinance provides no exceptions, even for interviews or for criminal investigations. *See* L.A. Admin. Code § 19.191(d). Not even California sanctuary statutes go so far. *See* Cal. Gov't Code § 7284.6(b)(5) (permitting access for interviews and for criminal enforcement).

59.     *Second*, the Ordinance discriminates against federal law and federal authorities—and favors non-federal authorities and picks and chooses among federal law enforcement authorities—in ways that are not permitted. By prohibiting ICE and CBP—but not other law enforcement—from accessing City property (*id.* § 19.191(d)), and from interviewing detainees (*id.* § 19.191(e)), the Ordinance further discriminates against the Federal Government. The Ordinance also curtails the freedom of the Federal Government to engage in contractual relationships with contractors for the information that the City government bars immigration authorities from accessing directly from City personnel. *Id.* § 19.192. Furthermore, the Ordinance discriminates against federal immigration authorities by prohibiting city personnel from "respond[ing] to any

administrative warrant for the purpose of Immigration Enforcement." *Id.* § 19.191(c).

60.    *Third*, the Ordinance discriminates between certain federal criminal laws. Specifically, it requires non-compliance with "federal criminal immigration law that penalizes a natural person's presence in, entry, or reentry to, or employment in, the United States." L.A. Admin. Code § 19.190.

61.    The City of Los Angeles and its officials have no lawful interest in assisting removable aliens' evasion of federal law enforcement.

62.    The City of Los Angeles and its officials, through the Ordinance, have singled out the Federal Government for disfavored treatment.

63.    The Ordinance and policies of Los Angeles are an obstacle to the Federal Government's enforcement of federal immigration laws and discriminate against federal immigration enforcement, as well as expressly violate 8 U.S.C. § 1373 and § 1644.

64.    By rejecting congressionally authorized means of enforcing federal immigration law, including detainers and administrative warrants, these provisions constitute unlawful direct regulation of the Federal Government.

## **CLAIMS FOR RELIEF**

### **COUNT ONE –**

### **VIOLATION OF THE SUPREMACY CLAUSE (PREEMPTION)**

65.    Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

66.    The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

67.    The City of Los Angeles' Ordinance Number 188441 "stand[s] as an obstacle to the accomplishment and execution" of the federal immigration laws and is therefore conflict preempted. *Arizona*, 567 U.S. at 406 (citation omitted). The Ordinance frustrates the expectation of collaboration reflected in the immigration laws, by barring

17

state and local officials from sharing information with federal immigration officials—even when they wish to do so. *See* L.A. Admin. Code §§ 19.191(a), 19.192. Specifically, the Ordinance's definition of the information that may not be shared with immigration authorities (*Id.* § 19.190 ("Citizenship or Immigration Status" shall mean all information or classification regarding citizenship of the United States . . . the authority to reside in or otherwise be present in the United States, including visa status, and the time or manner of a person's entry into the United States")) directly contradicts the requirements of 8 U.S.C. 1373(a) ("a . . . local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to . . . [ICE] information regarding the citizenship or immigration status, lawful or unlawful, of any individual.")).

68.     The Ordinance is expressly preempted by the requirements of 8 U.S.C. §§ 1373(a)-(b), 1644, 1357(g)(10)(A)-(B), requirements that local governments not prohibit or restrict information sharing with federal immigration officials regarding the citizenship or immigration status of any individual.

69.     Federal immigration law therefore preempts the Ordinance.

70.     Accordingly, the Ordinance violates the Supremacy Clause, interferes with federal law, and creates obstacles to the enforcement of federal immigration law both on its face and as applied to the Federal Government.

### COUNT TWO –
### VIOLATION OF THE SUPREMACY CLAUSE
### (UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)

71.     Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

72.     Los Angeles' Ordinance violates the doctrine of intergovernmental immunity by unlawfully regulating the Federal Government. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445; *see also Geo Group, Inc. v. Newsom*, 50 F.4th 745, 750 (2022) ("any state regulation that purports to override the federal government's decisions about

who will carry out federal functions runs afoul of the Supremacy Clause").

73.    The Ordinance attempts to single out federal immigration officials, expressly and impliedly, for unfavorable and uncooperative treatment when other law enforcement officials are not so treated. *See, e.g.*, L.A. Admin. Code § 19.190, 191.

74.    Moreover, the Ordinance prohibits local law enforcement agencies from compliance with valid civil warrants. *See Id.* §19.191(c).

75.    By refusing to honor civil detainers and warrants expressly authorized by Congress, Defendants have unlawfully eliminated these means for federal immigration officials to carry out their statutory functions. *See* 8 U.S.C. §§ 1226, 1357.

76.    Accordingly, the Ordinance unlawfully regulates the Federal Government in violation of the Supremacy Clause.

## COUNT THREE –
## VIOLATION OF THE SUPREMACY CLAUSE
## (UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)

77.    Plaintiff hereby incorporates the foregoing paragraphs of the Complaint as if fully stated herein.

78.    The City of Los Angeles' enforcement of the Ordinance discriminates against the Federal Government.

79.    Through various provisions of the Ordinance, Los Angeles "singles out" federal immigration authorities for disfavored treatment. *See Dawson v. Steager*, 586 U.S. 171, 178 (2019). But "burdening federal operations, and *only* federal operations . . . violates the anti-discrimination principle." *United States v. King Cnty., Washington*, 122 F.4th 740, 757-58 (9th Cir. 2024).

80.    The Ordinance specifically discriminates against the Federal Government by picking and choosing which federal criminal laws it will follow. The Ordinance forbids cooperation or compliance with "federal criminal immigration law that penalizes a natural person's presence in, entry, or reentry to, or employment in, the United States." L.A. Admin. Code § 19.190. Thus, the Ordinance singles out specific federal criminal

19

laws—but not others—for specially disfavored treatment. Also, multiple sections of the Ordinance discriminate against federal law insofar as those laws are for "the purpose of Immigration Enforcement." *Id.* § 19.191(a)-(e).

81.     Furthermore, the Ordinance specifically targets CBP and ICE in at least four ways. *First*, the Ordinance prohibits ICE and CBP—but not other law enforcement—from accessing property owned or controlled by the City of Los Angeles including city jails. *Id.* § 19.191(d). *Second*, it prohibits the City from making any person in City custody available to ICE or CBP—but not other law enforcement—for an interview for the purpose of both criminal and civil immigration enforcement. *Id.* § 19.191(e). *Third*, the Ordinance impairs federal immigration authorities' freedom of contract—but not other authorities—by requiring contractors with Los Angeles to "agree[] in writing to prohibit the contractor's employees and subcontractors from providing" information related to a person's immigration status. *Id.* § 19.192. *Fourth*, the Ordinance prohibits city personnel from "respond[ing] to any administrative warrant . . . for the purpose of Immigration Enforcement." *Id.* 19.191(c). City personnel remain free to respond to any other administrative warrant not related to immigration enforcement under the Ordinance.

82.     Such discriminatory targeting of the Federal Government is unlawful under the intergovernmental immunity doctrine. *See, e.g.*, *United States v. Washington*, 596 U.S. 832, 839 (2022) (A "state law discriminates against the Federal Government . . . if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status." (citations and alterations omitted)).

83.     For this additional, alternative reason, the Ordinance violates the Supremacy Clause.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests the following relief:

1.      That this Court enter a judgment declaring that the City of Los Angeles' Ordinance Number 188441 (codified at L.A. Admin. Code § 19.190 *et seq.*), violates the

20

Supremacy Clause, and is therefore unlawful, unenforceable, and void *ab initio*;

2.     That this Court enter a judgment declaring that the City of Los Angeles' Ordinance Number 188441 violates 8 U.S.C. §§ 1373 and 1644 and is therefore unlawful, unenforceable, and void *ab initio*;

3.     That this Court enter a permanent injunction barring Defendants—as well as any of their successors, agents, or employees—from enforcing City of Los Angeles Ordinance Number 188441;

4.     That this Court award the United States its fees and costs in this action; and

5.     That this Court award any other relief it deems just and proper.


Dated:  June 30, 2025                    Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

   */s/ Sean Skedzielewski*
SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General


BILAL A. ESSAYLI
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

   */s/ Paul (Bart) Green*
PAUL (BART) GREEN
Assistant United States Attorney

Attorneys for Plaintiff
United States of America