BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General
United States Department of Justice, Civil Division
950 Pennsylvania Ave NW, Ofc. 3631
Washington, DC 20530
Telephone: (202) 307-1697
Email: Sean.Skedzielewski@usdoj.gov

CHRISTOPHER LYERLA
Office of Immigration Litigation, Civil Division
U.S. Department of Justice

Attorneys for Plaintiff
United States of America

[*Additional counsel listed on next page*]

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF LOS ANGELES; *et al.*,<br><br>Defendants. | No. 2:25-cv-05917-FMO-JC<br><br>**THE UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Hearing Date:    October 2, 2025<br>Hearing Time:    10 a.m.<br>Location:          6D<br><br>Honorable Fernando M. Olguin<br>United States District Judge |

BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
PAUL (BART) GREEN (Cal. Bar No. 300847)
Assistant United States Attorney
      Federal Building, Suite 7516
      300 North Los Angeles Street
      Los Angeles, California 90012
      Telephone: (213) 894-0805
      Email: Paul.Green@usdoj.gov

# **TABLE OF CONTENTS**

DESCRIPTION                                                                     PAGE

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................2

    I.     Constitutional and Statutory Framework .................................... 2

    II.    The Challenged Sanctuary Law and Policies ...............................5

LEGAL STANDARD...........................................................................................6

ARGUMENT .........................................................................................................7

    I.     The Ordinance Is Preempted by Federal Immigration Laws. ......................7

        A.    8 U.S.C. §§ 1373 and 1644 Expressly Preempt The Ordinance.........7

        B.    The Ordinance Is Conflict Preempted. ............................................. 10

    II.    The Ordinance Violates Principles of Intergovernmental Immunity..........16

        A.    The Ordinance Unlawfully Discriminates Against the Federal
             Government....................................................................................... 16

        B.    The Ordinance Unlawfully Regulates the Federal Government. ...... 19

CONCLUSION ................................................................................................... 21

i

# TABLE OF AUTHORITIES

DESCRIPTION                                                                          PAGE

**CASES**

*Arizona v. U.S.*, 567 U.S. 387 (2012) .......................................................................passim

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................................7

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................7

*Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341 (2001) ...............................................15

*California v. Superior Ct. of California*, 482 U.S. 400 (1987) ........................................2

*Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582 (2011)............................................11

*City of New York v. United States*, 179 F.3d 29 (2d. Cir. 1999)....................4, 11, 12, 18

*CoreCivic, Inc. v. Gov. of New Jersey*, 145 F.4th 315 (2025).........................................19

*Davis v. Elmira Sav. Bank*, 161 U.S. 275 (1896) ....................................................11, 13

*Gartrell Construction Inc. v. Aubry*, 940 F.2d 437 (9th Cir. 1991) ..............................14

*Geo Grp., Inc. v. Newsom*, 50 F.4th 745 (9th Cir. 2022)..........................................15, 23

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .........................................................................3

*Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264 (1981) ....................17

*Knox v. Brnovich*, 907 F.3d 1167 (9th Cir. 2018) ..........................................................20

*Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) .....................................................22

*Mayo v. United States*, 319 U.S. 441 (1943) ..................................................................21

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ..........................................8

*Murphy v. NCAA*, 584 U.S. 453 (2018)......................................................................2, 16

*Nash v. Fla. Indus. Comm'n,* 389 U.S. 235 (1967) .........................................................13

*New York v. U.S. Dep't of Justice,* 951 F.3d 84 (2d Cir. 2020).................................5, 13

*Nielsen v. Preap*, 586 U.S. 392 (2019) ...........................................................................12

*North Dakota v. United States*, 495 U.S. 423 (1990) ..................................................3, 19

*Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341 (2d Cir. 2008) ..............................14

*Printz v. United States*, 521 U.S. 898 (1997)......................................................10, 16, 17

*Puerto Rico v. Branstad*, 483 U.S. 219 (1987).................................................................2

*South Carolina v. Baker*, 485 U.S. 505 (1988).................................................................3

*Ting v. AT & T*, 319 F.3d 1126 (9th Cir. 2003) ...........................................................15

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012)........................................16

*United States v. California*, 2018 WL 5780003 (E.D. Cal. Nov. 1, 2018).....................20

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ...................................passim

*United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010) ...................................23

*United States v. Ferrara*, 847 F. Supp. 964 (D.D.C. 1993)........................................22

*United States v. King County*, 122 F.4th 740 (9th Cir. 2024) ...........................20, 21, 23

*United States v. Locke*, 529 U.S. 89 (2000).................................................................15

*United States v. Washington*, 596 U.S. 832 (2022) ...................................................18

*Washington v. United States*, 460 U.S. 536 (1983) ...................................................18

**STATUTES**

8 U.S.C. § 1101 ............................................................................................................3

8 U.S.C. § 1103 ............................................................................................................5

8 U.S.C. § 1182 .......................................................................................................3, 19

8 U.S.C. § 1226 ..............................................................................................4, 5, 12, 22

8 U.S.C. § 1231 ..............................................................................................4, 5, 12, 19

8 U.S.C. § 1357 ..................................................................................................4, 5, 12

8 U.S.C. § 1373 ....................................................................................................passim

8 U.S.C. § 1644 ..........................................................................................5, 6, 11, 12

L.A. Admin. Code § 19.190.....................................................................................passim

L.A. Admin. Code § 19.191…………………………………………….…passim

L.A. Admin. Code § 19.195.2.........................................................................................7

L.A. Admin. Code §19.193..........................................................................................19

L.A. Admin. Code§ 19.192........................................................................................passim

iii

**INTRODUCTION**

The City of Los Angeles enacted its Prohibition of the Use of City Resources for Federal Immigration Enforcement, L.A. Admin. Code § 19.190 *et seq.* (Ord. No. 188441, 2024, the "Ordinance") in response to immigration enforcement policies of "the incoming federal administration, on January 20, 2025." The Ordinance has the purpose and effect of thwarting federal law enforcement efforts to detain and remove criminal illegal aliens. It prohibits local officers from responding to congressionally authorized detainers and administrative warrants. It denies federal immigration agents access to aliens who are already in local custody. The Ordinance also bans otherwise willing state and local officers from communicating information required by federal law to be accessible to federal immigration agents. And it interferes with the federal government's choice of contractors by refusing to work with such contractors if they share immigration information with the federal government. The Ordinance's provisions impede federal immigration enforcement and conflict with federal law on their own and when viewed in their totality.

These policies go beyond mere non-participation in immigration enforcement and instead serve to frustrate federally mandated immigration enforcement programs. These policies create an affirmative immigration policy of their own, explicitly contrary to that of the federal government. To be sure, our system of government contemplates two sovereigns—federal and state. But when a conflict between the two arises, the "Constitution, and the Laws of the United States … shall be the supreme Law of the Land." Const. Art. VI, cl. 2. Here, the United States, through the Immigration and Nationality Act ("INA"), regulates aliens within its borders, provides enforcement authority, and requires that local officials be permitted to voluntarily cooperate with immigration officials. The City of Los Angeles' Ordinance frustrates that federal program by obstructing immigration enforcement, discriminating against immigration enforcement agencies, and regulating the federal government's immigration-related actions. It does so openly motivated by its officials' hostility to a democratically elected

1

federal government and the American people's choice for their President. The United States has clearly stated a claim, and the Court should deny Defendants' Motion to Dismiss.

## BACKGROUND

### I.    Constitutional and Statutory Framework

The Constitution establishes a federalist system in which the federal government and the States both wield sovereign powers. *See Arizona v. U.S.*, 567 U.S. 387, 398 (2012). There are, however, "certain limits on the sovereign powers of the States, limits that are an essential part of the Framers' conception of national identity and Union," *California v. Superior Ct. of California*, 482 U.S. 400, 405 (1987). For example, the Constitution expressly prohibits States from entering into treaties and laying duties on imports and exports. *See* U.S. Const. art. I § 10. It also implicitly restricts States from exercising their powers in a way that would undermine grants of power to the Federal Government or harm other States. *See, e.g.*, *Puerto Rico v. Branstad*, 483 U.S. 219, 226 (1987) ("[T]he Extradition Clause creates a mandatory duty to deliver up fugitives upon proper demand[.]").

The Constitution grants enumerated legislative powers to Congress, *see* art. I, § 8, and confirms that legislative powers not granted to Congress are reserved for the States, *see* U.S. Const. amend. X. Under the Tenth Amendment, Congress must exercise its legislative power over individuals directly and may not commandeer States into enacting a federal regulatory program. *See Murphy v. NCAA*, 584 U.S. 453, 472 (2018). But when Congress exercises its enumerated powers, States cannot stand in the way. The Supremacy Clause provides that federal law is the "supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," art. VI, cl. 2. Under the Supremacy Clause, "state laws are preempted when they conflict with federal law." *Arizona*, 584 U.S. at 399. Therefore, a local enactment is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it

2

"discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

One of the enumerated powers the Constitution entrusts to Congress is to "establish an uniform Rule of Naturalization,", art. I § 8, cl. 4, thereby providing the federal government with "broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. Congress has executed this mandate through the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq*., and other related laws. This body of law confers upon the federal government the authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully present. *See, e.g*., 8 U.S.C. §§ 1182, 1225–29a, 1231. Based on these enumerated constitutional and sovereign powers, the federal government has broad authority to establish immigration laws, the execution of which States cannot obstruct or take discriminatory actions against. *See Arizona*, 567 U.S. at 394–95; *accord North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality).

While "[t]he federal power to determine immigration policy is well settled," "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 395, 411. "Absent any cooperation at all from local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *City of New York v. United States*, 179 F.3d 29, 35 (2d. Cir. 1999). Congress, through the INA, contemplated this framework of cooperation. For example, federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens[.]" 8 U.S.C. § 1226(d)(1)(A). Likewise, federal officials must "designate and train officers and employees . . . to serve as a liaison to" state and local officials "with respect to the arrest, conviction, and release of any alien charged with an aggravated felony[.]" *Id*. § 1226(d)(1)(B); *see id*. §§ 1226(c), 1231(a). And state and local officials may "cooperate with the [federal government] in the identification,

apprehension, detention, or removal of aliens not lawfully present in the United States." *Id*. § 1357(g)(10)(B).

In enacting the INA, Congress recognized that an alien who is subject to federal immigration proceedings may also be subject to state or local criminal law enforcement. The INA provides that federal officials generally "may not remove an alien who is sentenced to [state] imprisonment until the alien is released from [such] imprisonment." *Id*. § 1231 (a)(4)(A). The INA further authorizes, and in some cases requires, federal officials to assume custody immediately upon the alien's release from state or local custody. *See id.* §§ 1226(a), 1226(c). Pursuant to these obligations, Congress provided immigration agents several tools to effectuate their responsibilities under the INA. For example, the INA expressly authorizes federal immigration officers to arrest and detain aliens pursuant to administrative warrants. *See id*. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."). If immigration agents seek an alien in the custody of another law enforcement agency, they may issue an "immigration detainer" to advise that agency that the agents seek custody "for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see also* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration detainer is "a request that such agency advise the Department, prior to release of the alien, in order for the Department to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a).

Congress also acknowledged the need for information-sharing across and within governments when it enacted 8 U.S.C. §§ 1373 and 1644. With these provisions, "Congress sought to give state and local officials the authority to communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens, notwithstanding any local laws to the contrary." *New York v. U.S. Dep't of Justice,* 951 F.3d 84, 97 (2d Cir. 2020). (citations omitted). Section 1373 requires federal officials to "respond to an inquiry" by state or local officials "seeking to verify or

4

ascertain the citizenship or immigration status of any individual within the[ir] jurisdiction." 8 U.S.C. § 1373(c). It also provides that state and local government officials "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration authorities] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id*. § 1373(a); *see id*. § 1373(b). Similarly, § 1644 provides that "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the [federal government] information regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id*. § 1644.

## II.    The Challenged Sanctuary Law and Policies

On December 9, 2024, the City of Los Angeles enacted the Ordinance. L.A. Admin. Code § 19.190 *et seq.* The Ordinance prohibits City officials, including law enforcement officers, from participating in federal civil immigration enforcement and restricts cooperation with federal immigration enforcement. Specifically, the Ordinance provides that no Los Angeles City personnel are authorized to "inquire into or collect information about an individual's Citizenship or Immigration Status," unless that information is used by local authorities to provide services to the individual. L.A. Admin. Code § 19.191 (a). City personnel may not "investigate, cite, arrest, hold, transfer, or detain any person for the purpose of Immigration Enforcement," *id*. § 19.191 (b), nor "respond to any administrative warrant or other request to detain, transfer, or notify any Immigration Agent about the status or release of any individual for the purpose of Immigration Enforcement" *Id*. § 19.191 (c).

The Ordinance also goes beyond the provisions in California's Values Act in several ways. First, it protects criminal aliens in custody from immigration enforcement by prohibiting City personnel from "provid[ing] any Immigration Agent access to any non-public areas of property owned or controlled by the City, including City jails, for the purpose of Immigration Enforcement." *Id*. § 19.191(d). Also, City personnel may not

5

1    "make any person in City custody available to any Immigration Agent for an interview

2    for the purpose of Immigration Enforcement." *Id*. § 19.191(e). The Ordinance forbids

3    providing information related to citizenship or immigration status to a contractor, "unless

4    the contractor first agrees in writing to prohibit the contractor's employees and

5    subcontractors from providing that data or information to any Immigration Agent." *Id*.

6    § 19.192. Furthermore, even if City personnel possess such information, the Ordinance

7    prohibits them from sharing "information that can be used to determine" someone's

8    "classification regarding citizenship of the United States, . . . the authority to reside in or

9    otherwise be present in the United States, including visa status, and the time or manner

10   of a person's entry into the United States" with federal immigration officials. *Id*.

11   §§ 19.190, 19.192.

12       The Ordinance's sponsors made clear that its purpose was thwarting federal

13   immigration enforcement when they explained that "[w]e refuse to stand back while

14   Donald Trump tries to deport our neighbors, family, friends, and coworkers." ECF No. 1

15   at 2. Indeed, the Ordinance itself includes an "**URGENCY CLAUSE**" admitting that its

16   purpose is to stop the "incoming federal administration," *i.e.,* President Trump's second

17   administration, from carrying out its immigration policies. L.A. Admin. Code § 19.195.2

18   (emphasis in original).

19                              **LEGAL STANDARD**

20       A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the

21   sufficiency of claims asserted in a complaint. To survive a motion to dismiss for failure

22   to state a claim, a plaintiff must allege "enough facts to state a claim to relief that is

23   plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Allegations that "raise

24   [the plaintiff's] right to relief above the speculative level" are adequate to survive a

25   motion to dismiss. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Because

26   the United States' allegations satisfy that standard, Defendants' Motion should be

27   denied.

28

1

**ARGUMENT**

2

I.    **The Ordinance Is Preempted by Federal Immigration Laws.**

3

A.    **8 U.S.C. §§ 1373 and 1644 Expressly Preempt the Ordinance.**

4        Express preemption occurs when Congress explicitly precludes state or local

5   regulation in a particular area. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383

6   (1992). State and local governments may not prohibit or restrict the sharing of

7   "information regarding the citizenship or immigration status" with federal immigration

8   officials. 8 U.S.C. § 1373(a); *see also id*. § 1644 (similar). Further, "no person or agency

9   may prohibit, or in any way restrict, a Federal, State, or local government entity" from

10  "[s]ending", "[m]aintining," or "[e]xchanging" with any other government entity

11  "information regarding the immigration status, lawful or unlawful, of any individual." *Id*.

12  § 1373(b).

13       Sections 1373 and 1644 are valid preemption statutes that expressly preempt and

14  invalidate the Ordinance.[1] The Ordinance prohibits city employees from sharing

15  "information that can be used to determine or trace a person's Citizenship or

16  Immigration Status" with federal immigration officials. L.A. Admin. Code § 19.192. The

17  Ordinance also prohibits city employees from "inquir[ing] into or collect[ing]

18  information about an individual's Citizenship or Immigration Status," unless that

19  information is used by local authorities to provide services to the individual. *Id.* §

20  19.191(a).

21       Defendants argue that the Ordinance is lawful because on its face it pays homage

22  to federal law. ECF No. 25 at 13; *see also* L.A. Admin. Code § 19.192 ("Except as

23  required by 8 U.S.C. 1373 or other applicable federal or state law . . . "). But that

24  position cannot be squared with the Ordinance's stated objectives to "prohibit City

25  resources . . . from being utilized for immigration enforcement or for cooperation with

26

27  _____

28  [1] The presumption of validity does not apply in the express preemption context. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016).

7

federal immigration agents." Ord. No. 188441, 2024. Nor can it account for the language of the Ordinance itself, which by prohibiting sharing "information that can be used to determine or trace a person's . . . classification regarding citizenship of the United States or any other country, place of birth, the authority to reside in or otherwise be present in the United States, including visa status, and the time or manner of a person's entry into the United States," L.A. Admin. Code §§ 19.190, 19.192—imposes exactly the restriction that 8 U.S.C. § 1373 prohibits. Although the savings clause prohibits information sharing "[e]xcept as required by," federal law, Section 1373 does not *require* State and local officials to share and maintain that information but only prohibits restrictions on those activities. No provision in the Los Angeles Administrative Code affirmatively requires the sharing of information whose exchange is safeguarded by Section 1373. Thus, Los Angeles' "savings clause" forces City personnel to walk an impossibly fine line of being able to disclose "Citizenship or Immigration Status" as Section 1373 requires (with no affirmative local authorization to do so), while avoiding sharing information that can be used to "determine or trace" such status. L.A. Admin. Code § 19.192. Defendants cannot have it both ways through the mechanism of a purported "savings clause" while expressly commanding City personnel to withhold the information that Section 1373 prohibits restrictions on, all while openly enacting the Ordinance with a purpose that seeks to "undermine federal law." *Arizona*, 567 U.S. at 416.

Defendants claim the Ordinance "restricts City personnel from providing access to information that does not fall within Section 1373." ECF No. 25 at 13, *see also* L.A. Admin Code § 19.192. Because the Ninth Circuit has defined "information regarding the citizenship or immigration status" in Section 1373 to include only "a person's legal classification under federal law," Defendants argue that the broader prohibition in Section 19.192 "restricts the sharing of information not covered by Section 1373" and thus does not conflict with Section 1373. ECF No. 25 at 14. This ignores the fact that Section 19.192 of the Ordinance also restricts the sharing of information that *is* covered

by Section 1373. Prohibiting city personnel from divulging information that can be used to "determine or trace" Citizenship or Immigration Status naturally and in effect prohibits divulging the Citizenship or Immigration Status itself.

Federal law similarly preempts Section 19.191(a) of the Ordinance. Defendants assert that because this Section "restricts a City employee only from inquiring into or collecting information about a person's Citizenship or Immigration Status," it does not conflict with Section 1373, "which governs only the sharing, maintenance, or exchange of information *already collected*." *Id*. at 13 (emphasis in original). However, under Section 1373 "no person or agency may prohibit, *or in any way restrict*," a government entity from sending, maintaining, or exchanging such information. 8 U.S.C. § 1373(b) (emphasis added). Section 19.191(a) restricts the sending, maintaining, or exchanging of citizenship or immigration status by forbidding City personnel from inquiring into or collecting the information in the first place. Los Angeles' Ordinance thus goes beyond "opt[ing] not to participate in federal programs," *United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019), but instead affirmatively forbids its personnel from voluntarily complying with federal immigration law.

Defendants next argue that Section 1373 is invalid as a violation of the anticommandeering doctrine. ECF No. 25 at 14. This claim is meritless. Section 1373 falls within an information-gathering exception to the anticommandeering doctrine. *Printz v. United States*, 521 U.S. 898, 917-18 (1997). Defendants claim that *Printz* "did not recognize any such exception," ECF No. 25 at 16, but the Ninth Circuit in *California* found otherwise: "the Supreme Court has implied the existence of a Tenth Amendment exception for reporting requirements. *See Printz,* 521 U.S. at 917-18 (distinguishing between federal statutes that 'require only the provision of information to the Federal Government' and those that 'force [the] participation of the States' executive in the actual administration of a federal program')." *California*, 921 F.3d at 890. Indeed, while no federal circuit court of appeals has found that Section 1373's prohibition on information sharing is unconstitutional, the Second Circuit has explicitly rejected the

arguments Defendants make. *City of New York*, 179 F.3d at 35 ("the City's sovereignty argument asks us to turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs").

The federal government's power over immigration is broad, it has an interest in information sharing across government entities to facilitate immigration policy, and the INA, including Sections 1373 and 1644, do not leave room for the States to prohibit that voluntary cooperation. Congress's intent is clear: States cannot stand in the way of the Federal Government's regulation of aliens.

### B. The Ordinance Is Conflict Preempted.

A state law or policy is conflict preempted and invalid if it "either frustrates the purpose of the national legislation or impairs the efficiency of the[] agencies of the federal government to discharge the duties, for the performance of which they were created." *Davis v. Elmira Sav. Bank*, 161 U.S. 275, 283 (1896). Congress, through the INA, "established a 'comprehensive federal statutory scheme for regulation of immigration and naturalization' and set 'the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 587 (2011) (internal citation omitted). To ensure the successful implementation of those laws, Congress anticipated coordination between federal, state, and local officials. *See, e.g.*, 8 U.S.C. §§ 1373(a), 1373(b), 1644, 1357(g)(10); *see also City of New York*, 179 F.3d at 35 ("A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems").

Because Congress found that "deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers," *Nielsen v. Preap*, 586 U.S. 392, 398 (2019) (citation omitted), Congress requires federal immigration agents not only to refrain from removing an alien who is

10

sentenced to state imprisonment until the alien is released from such imprisonment, 8 U.S.C. § 1231(a)(4)(A), but to detain certain criminal illegal aliens immediately upon their release from State or local custody, pending their removal from the United States. *See, e.g.*, *id.* §§ 1226(a), (c), 1231(a).

The Ordinance has the combined effect of creating an impermissible obstacle to federal immigration officers' ability to detain and remove criminal illegal aliens as required by the INA. The Ordinance prevents City personnel from turning aliens over to federal custody when presented with congressionally authorized detainers and administrative warrants—even after the alien's local custody has ended, extinguishing the State's regulatory interest in the alien. L.A. Admin. Code § 19.191(a), (c). Congress intended the detention and removal process to be an expedited procedure. *See, e.g.*, 8 U.S.C. § 1231 ("Once an alien is ordered removed, the Attorney General must remove the alien from the United States within 90 days, and the alien must be detained during the removal period."). "[A] State's incarceration of an alien requires DHS to delay acting on its own statutory obligations to arrest, detain, and remove certain aliens until the State releases the alien," in which case, "coordination between the State and DHS is not only appropriate, but necessary, to allow the federal agency effectively to resume its obligations when the State has achieved its penal ones." *New York v. U.S. Dep't of Justice*, 951 F.3d 84, 121 (2d Cir. 2020).

But by refusing to turn aliens over to federal custody pursuant to detainers and administrative warrants, the Ordinance requires federal agents to independently track down and rearrest aliens at large when (and if) they learn that the alien has been released from state custody—and those agents must do so before the alien reoffends or absconds. The prohibition on honoring detainers and administrative warrants, while also denying immigration agents access to detention facilities and the aliens in custody, therefore endangers federal agents, the public, and aliens themselves. And it obstructs and impairs the efficiency of the federal process in a way that is inconsistent with the Congressional

1  design. *See Arizona,* 567 U.S. at 406; *Nash v. Fla. Indus. Comm'n,* 389 U.S. 235, 240

2  (1967); *Davis*, 161 U.S. at 283.

3         Even if federal agents could stake out Los Angeles jail facilities to try to

4  independently stage arrests when aliens emerge from custody, the Ordinance instructs

5  state and local officials to refuse ICE agents' requests for information that is critical for

6  that purpose. L.A. Admin. Code § 19.191(c). Other Ordinance prohibitions exacerbate

7  this obstructive effect, including those forbidding City personnel from inquiring into or

8  collecting information about an individual's citizenship or immigration status, providing

9  immigration agents access to non-public areas of property including jails, and making

10 any person in custody available to immigration agents for interviews. Forcing federal

11 agents to try to stage an arrest without even the most basic information about their target

12 such as his release date, makes immediate apprehension nearly impossible.

13 "[C]ompliance with the [Ordinance] would frustrate the purposes of the federal scheme."

14 *Pac. Cap. Bank, N.A. v. Connecticut*, 542 F.3d 341, 351 (2d Cir. 2008). In this way, the

15 Ordinance "imposes an obstructive, not-insignificant burden on federal activities," *see*

16 *California*, 921 F.3d at 880, and is thus preempted by federal law. Los Angeles' avowed

17 purpose is to impede the federal government's ability to apprehend individuals

18 unlawfully present, in violation of the INA and conflict with the this framework. Indeed,

19 the combined effect of Los Angeles' Ordinance is to create an affirmative city-wide

20 immigration policy of its own, which stands in explicit opposition to the federal

21 government's immigration policy. Los Angeles is not merely "refrain[ing] from

22 participation," *id.* at 889-90, but substituting its own preferred immigration policy by a

23 coordinated series of prohibitions designed to thwart enforcement.

24        Furthermore, individual provisions of the Ordinance implicate the "disruption of a

25 federal relationship" and therefore conflict with federal law. *See id.* at 881. The

26 Ordinance requires City personnel to bar immigration agents from "access[ing] . . . any

27 non-public areas" of City jails and to forbid immigration agents from interviewing "any

28 person in City custody." L.A. Admin. Code § 19.191 (d), (e). By requiring its personnel

to stand as an obstacle between immigration agents and aliens whom they wish to interview or access for lawful enforcement purposes, Los Angeles disrupts this key federal relationship.

The Ordinance also forbids City contractors from providing "information that can be used to determine or trace a person's Citizenship or Immigration Status" to immigration agents. *Id.* § 19.192. In effect, the Ordinance forces contractors who may otherwise work with federal immigration enforcement to refrain from doing so or lose its contractor status with Los Angeles. This disrupts the federal relationship between immigration agents and their contractors. *See Gartrell Construction Inc. v. Aubry*, 940 F.2d 437, 441 (9th Cir. 1991) (preemption where California conditioned the federal government entering into agreements with its chosen contractors on the state's own licensing standards being satisfied). The fact that the Ordinance does not instruct the federal government directly does not meaningfully distinguish the Ordinance from the state laws at issue in *Gartrell Construction*. The Ordinance limits the federal government's choice of contractors just as effectively through its regulation of other parties and thus "undermin[es]. . . a federal operation." *California*, 921 F.3d at 881; *see also Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 761 (9th Cir. 2022) (holding that state statute controlled federal operations by interfering with its contracting decisions).

Defendants also contend that the Ordinance is presumed valid "because states have the historic, sovereign power to regulate and protect the welfare, health, and safety of their people, which are purposes of the Ordinance." ECF No. 25 at 9. A presumption against preemption applies with respect to certain areas where states have historically exercised their police powers. *Id.* at 761. It does not apply "when a state law would interfere with inherently federal relationships," *id.*, nor "when the State regulates in an area where there has been a history of significant federal presence," *United States v. Locke*, 529 U.S. 89, 91 (2000). *See also Ting v. AT & T*, 319 F.3d 1126, 1136 (9th Cir. 2003). Los Angeles' policies are not entitled to the presumption because they have the effect of impeding immigration activities, which are "inherently federal in character,"

13

*Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347–48 (2001); *United States v. South
Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) (declining to apply the presumption
"because immigration is an area traditionally regulated by the federal government.");
*United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (similar).

Defendants characterize their obstruction of federal immigration enforcement as
their prerogative under the Tenth Amendment. ECF No. 25 at 10-11, 14-17. The Tenth
Amendment anticommandeering doctrine prevents Congress from "compel[ling] the
States to enact or enforce a federal regulatory program," or "circumvent[ing] that
prohibition by conscripting the State's officers directly." *Printz*, 521 U.S. at 935; *see
also Murphy*, 584 U.S. at 473. But the Tenth Amendment is not implicated where the
federal government seeks to regulate private actors. Indeed, *Murphy* expressly declined
to disturb the bedrock principle under the Supremacy Clause that state and local laws
that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." *Murphy*, 584
U.S. at 476–77. Because the federal government here seeks to regulate private
individuals—aliens—and prevent Defendants from interfering with its ability to do so,
the anticommandeering doctrine is not implicated.

Defendants' actions are far from passive. To the contrary, Defendants are actively
facilitating aliens' evasion of federal law by asserting criminal custody over aliens whom
the federal government seeks to detain and remove, and then prohibiting voluntary
sharing of vital information and ultimately terminating custody in a manner that hinders
federal detention and removal. Unlike in *Murphy*, where the federal statutory provision
at issue did not "impose any federal restrictions on private actors," but instead sought to
prohibit states from authorizing sports gambling schemes, *id.* at 480, here, the federal
government and the State both seek to regulate aliens. The issue is therefore not whether
the federal government has commandeered a State, but whether the State's scheme is
preempted insofar as it poses an obstacle to the effectuation of the federal scheme. And it
is precisely when two regulatory schemes collide in this fashion that the Supremacy

14

1    Clause prohibits the State from using its authority to create an obstacle to the functioning
2    of the federal scheme.
3            Indeed, given its exclusive authority over immigration, Congress could have
4    provided that it would immediately remove aliens regardless of pending state criminal
5    prosecutions. Instead, Congress allows States to enforce their criminal laws against
6    aliens before deportation. But if States choose to take this deal, they cannot maintain and
7    then terminate custody in a way that frustrates the federal government in assuming
8    custody for the purpose of removal. Allowing state criminal custody to continue while
9    forbidding the States from obstructing an orderly transfer to federal officers after such
10    State custody ends, does not in any sense "commandeer" the state into enforcing federal
11    law, but merely places conditions on the state's exercise of its own regulatory authority.
12    *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 290–91 (1981)
13    ("We fail to see why the Surface Mining Act should become constitutionally suspect
14    simply because Congress chose to allow the States a regulatory role."). So long as
15    Congress preempts the State from interfering with federal regulation of private parties, it
16    is not impermissibly regulating the State directly.
17            In *California*, the Ninth Circuit found that cases in which the Supreme Court
18    found preemption "concerned state laws that affirmatively disrupted federal operations
19    by mandating action (or inaction) contrary to the status quo." 921 F.3d at 888. Here, Los
20    Angeles has unlawfully mandated inaction on the part of City personnel. Without this
21    mandate, City personnel would be free to cooperate with federal immigration
22    enforcement. Therefore, the federal government is not "conscripting" the City's officers,
23    *see Printz*, 521 U.S. at 935, but merely demanding that the City not disrupt federal
24    operations by ordering its officers to rebuff immigration agents. The Tenth Amendment
25    is no obstacle because State and local governments do not have "an untrammeled right to
26    forbid all voluntary cooperation by [their] officials" with federal immigration
27    authorities," *City of New York*, 179 F.3d at 35.
28

1

## II.    The Ordinance Violates Principles of Intergovernmental Immunity.

### A.  The Ordinance Unlawfully Discriminates Against the Federal Government.

Los Angeles' Ordinance violates the intergovernmental immunity doctrine because it unlawfully discriminates against the federal government. *See United States v. Washington*, 596 U.S. 832, 838-39 (2022). A state law or policy discriminates against the federal government if it "singl[es] out the federal government for unfavorable treatment," *id.* at 839, and "treats someone else better than it treats them," *Washington v. United States*, 460 U.S. 536, 544–45 (1983). There is no *de minimis* exception to this rule. "Intergovernmental immunity is implicated when *any* burden is imposed exclusively on the federal government." *California*, 921 F.3d at 884 n.9. Los Angeles' Ordinance does just that.

The Ordinance prohibits City funds or personnel from assisting in the enforcement of federal immigration policies, inquiring into immigration status, responding to an administrative immigration warrant, allowing access to non-public areas of City property for immigration enforcement, and interviewing anyone in City custody. L.A. Admin. Code §§ 19.191-19.192. City personnel are not permitted to inquire into or collect information about an individual's citizenship or immigration status, "unless such information is necessary to provide a City service." *Id.* §§ 19.191(a). Los Angeles police are not permitted to provide immigration agents access to individuals in their custody or allow immigration agents to use police facilities to interview suspects "for the purpose of Immigration Enforcement," *Id.* §§ 19.191(e), which includes efforts to investigate violations of criminal law related to immigration. *Id.* §§ 19.190. And Los Angeles police are prohibited from complying with congressionally authorized administrative warrants "for the purpose of Immigration Enforcement." *Id.* §§ 19.191(c). The Ordinance does not similarly prohibit compliance with a warrant for "a criminal offense issued by a federal or state judge," *Id.* §§ 19.193.

16

These provisions, on their face, treat federal immigration agents less favorably than other law enforcement agencies (and the general public) and discriminatorily burden the United States in carrying out its immigration enforcement functions. *See North Dakota*, 495 U.S. at 438 ("[s]ince a regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself, the Court has required that the regulation be one that is imposed on some basis unrelated to the object's status as a government contractor or supplier"); *see also CoreCivic, Inc. v. Gov. of New Jersey*, 145 F.4th 315 (2025) (state law prohibiting state and local governments, and private parties from entering into contracts to detain individuals for federal civil immigration violations, violated intergovernmental immunity by directly regulating the federal government). They interfere with the government's ability to comply with the congressional mandate to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or found to be, unlawfully present. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231. On their face, the provisions do not prevent City personnel from sharing the information that immigration agents seek—including release dates and contact information—with anyone else, including members of the public and other law enforcement agencies. *See* L.A. Admin. Code §§ 19.192, 19.191(c). The Ordinance also facially treats immigration agents worse than even other federal law enforcement agents. And they do not "merely reference[] or … single[] out federal activities in an . . . innocuous manner." *Cf. California*, 921 F.3d at 881. Instead, they go beyond "incidental effects in an area of federal interest," *Knox v. Brnovich*, 907 F.3d 1167, 1177 (9th Cir. 2018), and impose "a specialized burden on federal activity," obstructing federal agents' ability to enforce the immigration laws. *California*, 921 F.3d at 882.

Defendants argue that the Ordinance cannot unlawfully discriminate against the federal government because "there are not comparable classes of federal and state employees or laws because only Congress can pass immigration enforcement laws and determine who enforces those laws." ECF No. 25 at 20. Thus, Defendants argue, it is

1   "simply not possible" for the City to engage in unlawful discrimination. *Id*. Indeed, if the

2   law were as Defendants characterize it, requiring analogous areas of enforcement

3   between local and federal offices for there to be unlawful discrimination, no suit based

4   on intergovernmental immunity would be possible in the immigration realm. However,

5   singling out functions that only the federal government performs for differential

6   treatment *is* evidence of discrimination. If the only difference justifying the

7   discriminatory treatment is the federal agency's enforcement of a particular federal law,

8   the discrimination is clear. *See United States v. King County*, 122 F.4th 740, 757–58 (9th

9   Cir. 2024) (rejecting the County's argument that "significant differences" between ICE

10  and others who chartered flights justified the discriminatory treatment of ICE where the

11  difference was ICE's role in carrying out deportations); *United States v. California*, 2018

12  WL 5780003, at *6 (E.D. Cal. Nov. 1, 2018) (rejecting California's argument that it

13  could discourage conveyances of federal public lands because those lands, unlike private

14  lands, are preserved for the public's benefit: "This quality of federal public lands,

15  however, is so directly linked to their federal status that it cannot serve as the basis for

16  nondiscriminatory differentiation."). Here, the Sanctuary Policies do not single out an

17  exclusively federal function innocuously. They discriminatorily burden the United States

18  in carrying out that function specifically because of their disagreement with federal

19  policy. "[B]urdening federal operations, and *only* federal operations . . . violates the anti-

20  discrimination principle[.]" *King County*, 122 F.4th at 757–58.

21        Defendants argue that Los Angeles is merely refusing to assist federal

22  immigration enforcement and again contends that any ruling to the contrary would run

23  afoul of the Tenth Amendment. ECF No. 25 at 19-20. However, Defendants cannot

24  seriously contend that actively discriminating against the federal government is

25  constitutionally protected inaction. Rather, to the extent Los Angeles chooses to give

26  other law enforcement agencies and members of the public access to information,

27  detainees in their custody, and facilities, it cannot withhold the same from immigration

28  agents just because of its officials' disagreement with federal immigration priorities. *See,*

1    *e.g., King County*, 122 F.4th at 758 (there is no "threat of unconstitutional

2    commandeering when ICE uses county highways to transport immigration detainees

3    from one place to another just because the county owns its highways"). Similarly, there

4    is no such threat when immigration agents access detainees upon their release from local

5    custody or when they access information already collected by Los Angeles police.

6    **B.   The Ordinance Unlawfully Regulates the Federal Government.**

7    Los Angeles' Ordinance similarly violates intergovernmental immunity principles

8    where they have the effect of unlawfully regulating the federal government. *See Mayo v.*

9    *United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are

10    free from regulation by any state."). Accordingly, "even in the absence of a specific

11    federal law, federal officers are immune from state interference with acts 'necessary and

12    proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F.

13    Supp. 964, 968 (D.D.C. 1993) (internal citation omitted).

14    Under those principles, the Ordinance improperly regulates the federal

15    government by prohibiting City personnel from responding to any administrative warrant

16    for an alien's detention or transfer when Congress has authorized federal immigration

17    officials to use detainers and administrative warrants for those purposes. *See* L.A.

18    Admin. Code § 19.191(c). The Ordinance also does so by prohibiting access to City

19    property and access to detainees for interviewing, *id.* at § 19.191(d), (e), and requiring

20    the City to "either not provide [a] contractor with the information covered by Section

21    19.192 or not do business with the contractor if the information is necessary to the

22    contractor's work." ECF No. 25 at 18.

23    Congress expressly provided that "[o]n a warrant issued by the Attorney General,

24    an alien may be arrested and detained pending a decision on whether the alien is to be

25    removed from the United States." 8 U.S.C. § 1226(a). The Ordinance therefore

26    forecloses federal immigration officials' use of the congressionally authorized detention

27    method and directly impose a different method, with a different standard, on the federal

28    government for effectuating detentions. But Los Angeles has no such power to prevent

19

federal agents from carrying out their duties "until they satisfy a state officer." *See Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *see also Arizona*, 567 U.S. at 406 (recognizing that "a conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy" (alterations and citation omitted)). The Ordinance's prohibition of transferring removable aliens to immigration agents or even information about their release likewise regulates federal functions. The Ordinance thus requires the release of dangerous criminals onto the streets, where they all too often reoffend and commit serious crimes, forcing federal immigration officers to engage in difficult and dangerous efforts to rearrest aliens who were previously in local custody. Similarly, by limiting the federal government's choice of contractors by forcing the contractor to choose between working with federal immigration enforcement or working with the City, the Ordinance regulates immigration enforcement.

Defendants counter that the Ordinance "exclusively regulates City personnel and resources." ECF No. 25 at 17. In support of this contention, they cite *California*, 921 F.3d at 887. However, since the Ninth Circuit's decision in that case, it has recognized that laws can regulate the federal government even though, as here, they appear to regulate others. *See, e.g., Geo Grp., Inc.*, 50 F.4th at 759-60 (state statute disallowing the use of private contractors to run detention facilities within the state unlawfully regulated the federal government in violation of the intergovernmental immunity doctrine); *King County*, 122 F.4th at 756-57 (county order preventing contractors who leased space from the county's airport from servicing ICE unlawfully regulated the federal government). Defendants attempt to distinguish these cases by claiming that the Ordinance "does not directly regulate contractors." ECF No. 25 at 18. However, by their own admission, the City refuses to work with contractors unless the contractor toes the Ordinance's line not to provide immigration-related information to federal authorities. *Id*. The Ordinance thus accomplishes the same end-run regulation of federal immigration enforcement by regulating its contractors. The Constitution prohibits cities from impeding federal operations in this way. *See United States v. City of Arcata*, 629 F.3d

20

986, 991 (9th Cir. 2010) ("By constraining the conduct of federal agents and employees, the ordinances seek to regulate the government directly.").

Collectively, these effects of the Ordinance "'require[] ICE to entirely transform its approach to' its sovereign function of transporting and removing noncitizen detainees." *See King County*, 122 F.4th at 756. "Because this impermissibly override[s] the federal government's decision, pursuant to discretion conferred by Congress," as to how to effectuate detentions and removals, the Ordinance is invalid under the intergovernmental immunity doctrine's regulation prohibition. *See id.* Thus, the United States has sufficiently pled a claim of unlawful regulation.

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' Motion to Dismiss.

Dated:  September 11, 2025          Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

DREW C. ENSIGN
Deputy Assistant Attorney General

SEAN SKEDZIELEWSKI
Counsel to the Assistant Attorney General

CHRISTOPHER LYERLA
Office of Immigration Litigation
Civil Division
U.S. Department of Justice

BILAL A. ESSAYLI
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
PAUL (BART) GREEN
Assistant United States Attorney

*/s/ Christopher Lyerla*

Attorneys for Plaintiff
United States of America

Certificate of Compliance with L.R. 11-6.2

The undersigned, counsel of record for the United States, certifies that this brief contains 6,875 words, which complies with the word limit of L.R. 11-6.1.

Dated:  September 11, 2025              */s/ Christopher Lyerla*