Jonathon P. Hauenschild (SBN 249615)
FEDERATION FOR AMERICAN IMMIGRATION REFORM
25 Massachusetts Ave., NW, Ste. 330
Washington, DC 20001
(202) 328-7004
jhauenschild@fairus.org

Counsel for *Movant* Federation for American Immigration Reform

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiffs,

v.

CITY OF LOS ANGELES, *et al.*,

Defendants.

Case No. 2:25-cv-05917

**PROPOSED BRIEF OF FEDERATION FOR AMERICAN IMMIGRATION REFORM AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Courtroom 6D, Hon. Judge Fernando Manzano Olguin

///

///

///

///

[Page Intentionally Left Blank]

///

///

///

///

FAIR Proposed Amicus Brief; No. 2:25-cv-05917

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

INTEREST OF *AMICUS CURIAE* ............................................................. 1

SUMMARY OF ARGUMENT ...................................................................... 1

ARGUMENT ................................................................................................. 2

I. The Defendant's Sanctuary Policies are Preempted ................................ 2

    A. The Sanctuary Policies are conflict-obstacle preempted ................. 4

    B. The Sanctuary Policies are conflict-impossibility preempted. ......... 8

II. The Tenth Amendment does not Shield Los Angeles's Sanctuary Policies Because the Constitution Delegated Authority over Immigration and Naturalization to the Federal Government ......................................... 10

CONCLUSION ............................................................................................ 12

# TABLE OF AUTHORITIES

**CASES**

*Arizona v. United States*,
    567 U.S. 387 (2012).................................................................. 3, 5, 11

*California v. ARC America Corp.*,
    490 U.S. 93 (1989).........................................................................3

*Chirac v. Lessee of Chirac*,
    15 U.S. (2 Wheat.) 259 (1817)................................................... 12

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999)....................................................... 5, 6

*De Canas v. Bica*,
    424 U.S. 351 (1976)................................................................. 2, 3

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
    373 U.S. 132 (1963).........................................................................3

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992)..........................................................................4

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)................................................................. 11

*Harding v. Galceran*,
    889 F.2d 906 (9th Cir. 1989) .........................................................4

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952)................................................................. 11

*Hernandez v. Mesa*, 589 U.S 93 (2020)........................................... 11

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)................................................................. 2, 3

*Knox v. Brnovich*,
    907 F.3d 1167 (9th Cir. 2018) ................................................ 3, 10

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................. 11

*Oneok, Inc. v. Learjet, Inc.*,
    575 U.S. 373 (2015) ............................................................. 3, 10

*Tafflin v. Levitt*,
    493 U.S. 455 (1990) ................................................................. 11

*Truax v. Raich*,
    239 U.S. 33 (1915) ..................................................................... 2

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ................................................................. 11

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ................................................................. 12

*United States v. Singh*,
    979 F.3d 697 (9th Cir. 2020) ................................................... 12

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898) ................................................................. 12

**STATUTES**

8 U.S.C. § 1101 ................................................................................ 8

8 U.S.C. § 1324 ............................................................................ 8, 9

8 U.S.C. § 1326 ................................................................................ 7

8 U.S.C. § 1357 ................................................................................ 6

8 U.S.C. § 1373 ............................................................................ 5, 6

8 U.S.C. § 1644 ................................................................................ 6

**OTHER AUTHORITIES**

City of Los Angles, Executive Directive No. 12 ............................. 4

Los Angeles Ordinance No. 188441 ...................................... 4, 7, 9

THE FEDERALIST NO. 32 (Alexander Hamilton) ............................ 3

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. X ................................................................. 10

U.S. CONST. art. I, § 8, cl. 18 ......................................................2

U.S. CONST. art. I, § 8, cl. 4 ........................................................2

U.S. CONST. art. VI, cl. 2 ............................................................3

## INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a non-profit 501(c)(3) public interest organization dedicated to informing the public about the effects of both unlawful and lawful immigration, and to defending in court the interests of Americans in limiting overall immigration, enhancing border security, and ending illegal immigration.

FAIR has been involved in more than 100 legal cases since 1980, either as a party or as *amicus curiae*. The decision in this case will likely have an impact on the ability of the executive branch of the federal government to identify and deal efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million people in the United States. *Amicus* FAIR has direct and vital interests in defending the executive branch's ability to address the current illegal alien crisis and in State and local officials' ability to cooperate with federal immigration law enforcement.

## SUMMARY OF ARGUMENT

Los Angeles's sanctuary policies impede and interfere with federal immigration law enforcement and were designed to do just that. By prohibiting local officers from sharing immigration-related information with federal officers, the policies stand as an obstacle to that cooperation among federal, state, and local law enforcement which it has been the purpose of Congress to facilitate. The policies also make it more difficult for the federal government to achieve another, very obvious, purpose of Congress: enforcement of the immigration laws it has passed. As obstacles to both of

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

these congressional purposes, the policies violate the Supremacy Clause of the Constitution.

The Defendants' sanctuary policies also require City officials to withhold information about the location of removable aliens from federal officials, in violation of federal anti-harboring provisions. The policies thus violate the Supremacy Clause by making it impossible for City officials to obey both them and federal law.

The Tenth Amendment is no defense. The Constitution has delegated to the federal government the power to control the admission and expulsion of aliens, and has prohibited, through the Supremacy Clause, states from adopting measures that conflict with federal law. On both grounds, a power to enact the City's preempted immigration policies does not meet the conditions set forth in the Tenth Amendment for the reservation of a power to the states.

## ARGUMENT

### I.    The Defendant's Sanctuary Policies are Preempted

The Constitution provides that "Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization." U.S. CONST. art. I, § 8, cl. 4. When read together with the Necessary and Proper clause, the Naturalization Clause grants Congress plenary power over the admittance of aliens into, and the conditions of their lawful presence in, the United States. *Id.* at cl. 18. The plenary power of Congress in this arena has long been affirmed by the Supreme Court. *See, e.g.*, *De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."); *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941) ("The supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution . . . ."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority

to control immigration—to admit or exclude aliens—is vested solely in the
Federal Government.").

Contrary to Defendants' assertions, Congress does not need a "clear
statement" to preempt State laws and regulations when the Constitution
clearly delegates the authority in question to Congress. ECF 25 at p. 9. The
Framers well understood the threats associated with the *lack* of uniform
rules. As Alexander Hamilton noted, the authority to establish a uniform rule
of naturalization "must necessarily be exclusive, because if each state had
power to describe a distinct rule, there could not be a uniform rule." THE
FEDERALIST NO. 32 (Alexander Hamilton), 250-51 (John C. Hamilton, ed.,
1998).

Under the Supremacy Clause, U.S. CONST. art. VI, cl. 2, state laws
may be preempted by federal law. Preemption may be either express or
implied, and implied preemption includes both conflict preemption and field
preemption. A state statute is conflict preempted if compliance with both
that statute and federal law is impossible. *Oneok, Inc. v. Learjet, Inc.*, 575
U.S. 373, 376-377 (2015), *citing California v. ARC America Corp.*, 490 U.S.
93 (1989), *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–
43 (1963). *See also*, *Knox v. Brnovich*, 907 F.3d 1167, 1174-75 (9th Cir.
2018) (broadly discussing preemption). A state law, including an
immigration-related one, is also conflict preempted if it "stands as an
obstacle to the accomplishment and execution of the full purpose and
objectives of Congress." *De Canas*, 424 U.S. at 363 (quoting *Hines*, 312
U.S. at 67), *Knox*, 907 F.3d at 1175, *see also*, *Arizona v. United States*, 567
U.S. 387, 399 (2012). "[U]nder the Supremacy Clause, from which our pre-
emption doctrine is derived, 'any state law, however clearly within a State's
acknowledged power, which interferes with or is contrary to federal law,
must yield.'" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108

(1992) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)), *Harding v. Galceran*, 889 F.2d 906, 908 (9th Cir. 1989).

Defendants promulgated or adopted the policies expressly to frustrate the enforcement of the Immigration and Naturalization Act (INA).[2] Indeed, California and Los Angeles pride themselves on being Sanctuary jurisdictions. Officials issue guidance further interpreting the ordinances with the intent to further obstruct enforcement of immigration law.[3]

**A. The Sanctuary Policies are conflict-obstacle preempted.**

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals.

---

[2] E.g. Los Angeles Ordinance No. 188441 (Eff. Dec. 19, 2024), Sec. 19.195.2, available at: https://cityclerk.lacity.org/onlinedocs/2023/23-0243_ord_%20188441_12-19-24.pdf (Expressing that the stated purpose of the Ordinance is to interfere with the federal government's anticipated mass deportations and use of military assets to enforce federal immigration law).

[3] E.g. City of Los Angles, Executive Directive No. 12 (July 11, 2025), available at: https://mayor.lacity.gov/news/mayor-bass-issues-executive-directive-support-immigrant-communities (Requiring the Immigrant Affairs Liaison to report "any federal immigration enforcement activity on City properties or facilities," recommend "services or programs" that can be "leveraged" for the benefit of "Angelenos harmed by federal immigrant enforcement actions," and more); Los Angeles Employee Relations Bulletin re: Prohibition on the Use of City Resources for Federal Immigration Enforcement – Ordinance No. 188441 (June 6, 2025), available at: https://cao.lacity.org/erd/ERBulletins/ERBulletin-2025-06-09.pdf (Requiring, among other things, each department to designate an Immigrant Affairs Liaison, precluding personnel from providing federal immigration officials information "that can be used to determine an individual's 'Citizenship or Immigration Status'" and extending the requirement to City contractors; prohibiting immigration officials from accessing City facilities not open to the general public even to execute warrants, and more.)

> Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding that 8 U.S.C. § 1373 is constitutional).

By design, Defendants' Sanctuary Policies frustrate the INA in two of its central purposes—not only the obvious purpose that immigration law be enforced, but the federal-state cooperation Congress intended to foster in that enforcement.

As the Supreme Court has recognized, "consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. For example, in passing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009 ("IIRIRA"), which includes 8 U.S.C. § 1373, Congress sought unimpeded communication among federal, state, and local governments in sharing immigration status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens. The Senate Judiciary Committee Report accompanying IIRIRA makes this general purpose clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996), quoted in *City of New York*, 179 F.3d at 32-33. Thus, in drafting § 1373, Congress sought to foster a cooperative

effort among local, state, and federal law enforcement in the enforcement of immigration law.

Shortly before enacting IIRIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105 (PRWORA). Entitled "Communication between State and local government agencies and Immigration and Naturalization Service," section 434 of this law (codified at 8 U.S.C. § 1644, is nearly identical to § 1373. *E.g.*, *City of New York*, 179 F.3d at 31-32. This provision of PRWORA forbids any prohibitions or restrictions on the ability of state or local governments to send to or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. Going further than the Senate Judiciary Committee Report accompanying IIRIRA, in the Conference Report accompanying PRWORA, Congress made clear its intent in passing § 1644: to bar any restriction on State and local government entities in their communications with ICE, including about the whereabouts of illegal aliens, which obviously includes the time of their release from detention.

> This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS. The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.), quoted in *City of New York*, 179 F.3d at 32.

Another federal statute also has the purpose of fostering cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear

that no agreement is needed for state and local officers or employees "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." § 1357(g)(10)(A). Likewise, Congress has refused to require any formal agreement for state and local officers or employees to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B).

Defendants' Sanctuary Policies frustrate, and are intended to frustrate, federal enforcement of immigration law. By design, the policies keep ICE in the dark about an alien's place of birth, country of origin, home and work addresses, place of employment, incarceration status, and other information of the kind contemplated by PRWORA, which ICE depends on to conduct enforcement operations. For example, Defendant's policies prohibit personnel from providing "access to any City data or information that can be used to determine or trace a person's Citizenship or Immigration Status to any Immigration Agent,"[4] or even inquiring about or collecting "information about an individual's Citizenship or Immigration Status."[5] Further, the policies specifically reference and interfere with federal immigration officials' responsibilities and duties under 8 U.S.C. § 1326 (criminalizing illegal reentry into the United States of previously removed aliens).[6]

Because the Sanctuary Policies, by their terms, mandate noncooperation with federal enforcement of immigration laws, and have

[4] Ordinance No. 188441, § 19.192
[5] *Id.* at § 19.191(a)
[6] *Id.* at § 19.191(b)

both the intent and the effect of hampering such enforcement, they thwart both the congressional purpose of fostering such cooperation and Congress's undoubted intent that that the federal government enforce the immigration laws effectively.

**B. The Sanctuary Policies are conflict-impossibility preempted.**

In addition to being obstacle preempted, the Sanctuary Policies require that officials in Los Angeles violate the federal anti-harboring statute, section 274(a) INA, codified at 8 U.S.C. § 1324. ECF 1 at ¶¶ 51-64. The anti-harboring statute reads, in pertinent part:

> **Bringing in and Harboring Certain Aliens**
>
> **(a) Criminal penalties.—**
>
> (1)    (A) Any person who—
> …
> (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; . . .
>
> (v) (I) engages in any conspiracy to commit any of the preceding acts, or (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).
>
> (B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—
> …
> (ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, United States Code, imprisoned not more than 5 years, or both . . . .

The INA defines "person" when used in Title II as "an individual or an organization." 8 U.S.C. § 1101(b)(3). "The term 'organization' means, but is not limited to, an organization, corporation, company, partnership,

association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects." 8 U.S.C. § 1101(a)(28). Thus, § 1324 applies to municipal corporations and unincorporated areas alike, which, under the INA's sweeping definition, are organizations, and thus persons.

By preventing local law enforcement from providing the information or cooperation that ICE requests in the course of enforcing federal immigration laws, Los Angeles's policies compel local law enforcement to "conceal[], harbor[], or shield[] from detection" aliens in "any place, including any building" (or to attempt to do so) in violation of 8 U.S.C. § 1324(a)(1)(a)(iii). For example, when ICE requests information about the detention, transfer, or release of any illegal alien, and local authorities refuse to give that information to it, as mandated by the Defendants' policies, the local authorities are thereafter "shielding" the alien's presence, and therefore the alien, "from detection" either in the jail (a "building"), outside the jail (a "place"), or in any "non-public areas of property owned or controlled by the City," depending on the alien's location at any given moment. *E.g.* Ordinance No. 188441, § 19.191. Also, if ICE requests the home address of a released alien, and local officials refuse to give it that information, as mandated by the Defendants' policies, they are "conceal[ing]" the alien "in a[] building" at any time the alien is at that address. Or, if ICE agents arrive at a local jail to assume custody of, or question, an alien, and local authorities, as mandated by the policies, both refuse them entry and do not transfer custody or permit questioning outside of the jail, the local officials are "harbor[ing]" the alien "in . . . a[] building" while the alien remains in the jail, "harbor[ing]" the alien "in . . . a[] place" if they bring the alien outside the jail and there refuse to transfer custody, or concealing the alien

"in a[] place" if they deliberately slip the alien out of the jail in a way that evades the agents' notice. Even if local law enforcement claims that receiving a Form I-247A (INS Immigration Detainer Notice of Action form notifying local law enforcement of an alien's removability)[7] from ICE does not give it the requisite knowledge of an alien's unlawful presence, the form includes a probable cause determination by the U.S. Department of Homeland Security that the alien is removable, thus at the very least making law enforcement's noncompliance in "reckless disregard" of the alien's unlawful presence. *Cf.* Ordinance No. 188441, § 19.191(c) (forbidding personnel to "[r]espond to any administrative warrant or other request to detain, transfer, or notify any Immigration Agent" relating to any alien in custody).

Accordingly, Los Angeles's sanctuary policies compel local law enforcement to violate the federal anti-harboring statute. In doing so, they make obedience to both federal and local law an impossibility, and therefore are conflict preempted. *E.g., Oneok,* 575 U.S. at 377; *Knox*, 907 F.3d at 1175.

## II. The Tenth Amendment does not Shield Los Angeles's Sanctuary Policies Because the Constitution Delegated Authority over Immigration and Naturalization to the Federal Government

Defendants attempt to justify their sanctuary policies under the Tenth Amendment, suggesting that the Complaint should be dismissed on this basis. E.g. ECF 25 at pp. 2, 14-17, 19-20. The Tenth Amendment, however, reserves only "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. CONST. amend. X. Thus, when a

---

[7] Sample form available at https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

party invokes the Tenth Amendment against a federal enactment, courts must ask whether the law (or action) in question was enacted "within the powers granted [the United States] under the Constitution." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), *see also*, *New York v. United States*, 505 U.S. 144, 155 (1992) ("In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I."). If Congress acts within its constitutional powers, through the Supremacy Clause, "Congress may impose its will on the States." *Gregory*, 501 U.S. at 460. *See also Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) (holding that States possess "sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause"). In other words, no state has a power reserved in the Tenth Amendment to take measures that conflict with federal laws that conform to the Constitution, because the Constitution, through the Supremacy Clause, prohibits any such power to the states.

The power to regulate immigration is an attribute of sovereignty and derives from constitutional provisions empowering the federal government to regulate foreign commerce, foreign relations, and national security. *See, e.g.*, *Hernandez v. Mesa*, 589 U.S 93, 104 (2020) (recognizing that governance and investigation of Border Patrol conduct is a matter "relating to the conduct of foreign relations" and the Executive Branch "has the lead role in foreign policy"), *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (holding that immigration related decisions "implicate relations with foreign powers or involve classifications defined in the light of changing political and economic circumstances"); *Arizona*, 567 U. at 395 ("The Constitution grants the federal government an 'undoubted power over the subject of immigration and the status of aliens'"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952) ("[A]ny policy toward aliens is vitally and intricately

interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of republican form of government"); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950) (holding that the right to control immigration and naturalization "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.").

Thus, the power to regulate both naturalization and immigration is delegated by the Constitution to the United States. *United States v. Wong Kim Ark*, 169 U.S. 649, 701 (1898), *citing Chirac v. Lessee of Chirac*, 15 U.S. (2 Wheat.) 259 (1817) ("The power, granted to Congress by the Constitution, 'to establish an uniform rule of naturalization,' was long ago adjudged by this court to be vested exclusively in Congress"). Because the Constitution delegates power over naturalization and immigration to the federal government, and the City's policies are preempted by federal law made pursuant to that power, the Tenth Amendment does not reserve the power to make those policies to either Los Angeles or the State of California.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

///

///

///

///

///

///

///

///

Dated: September 24, 2025          Respectfully submitted,


                                  s/ Jonathon P. Hauenschild
                                  Jonathon P Hauenschild
                                  FEDERATION FOR AMERICAN IMMIGRATION
                                  REFORM
                                  25 Massachusetts Ave., NW, Suite 330
                                  Washington, DC 20001
                                  (202) 328-7004
                                  jhauenschild@fairus.org

                                  Counsel for *Movant*
                                  Federation for American Immigration
                                  Reform

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for *movant* Federation for American Immigration Reform, certifies that this document contains 3,164 words, which complies with the word limit of L.R. 11-6.1.

Dated this 24th day of September, 2025

s/ Jonathon P. Hauenschild
Jonathon P. Hauenschild
